# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ALEXIS WISCHER o/b/o/  
Katrina Ernst, Deceased,  
    Plaintiff,

vs.

COMMISSIONER OF  
SOCIAL SECURITY,  
    Defendant.

Case No. 1:13-cv-810  
Barrett, J.  
Litkovitz, M.J.

**REPORT AND  
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB).[1]  This matter is before the Court on plaintiff's Statement

of Errors (Doc. 13), the Commissioner's response in opposition (Doc. 18), and plaintiff's reply

memorandum (Doc. 19).

## I.  Procedural Background

Plaintiff filed an application for DIB in December 2009, alleging disability since March

1, 2005, due to post traumatic stress disorder (PTSD), recurrent depressive psychosis,

generalized anxiety disorder, agoraphobia, and chronic back pain.  (Tr. 212, 291).  Plaintiff's

application was denied initially and upon reconsideration.  Plaintiff, through counsel, requested

and was granted a *de novo* hearing before administrative law judge (ALJ) Samuel Rodner.

Plaintiff's mother, a psychological medical expert (ME), and a vocational expert (VE) appeared

and testified at the ALJ hearing.  On June 21, 2012, the ALJ issued a decision denying plaintiff's

---

[1] This matter concerns review of the Commissioner's denial of benefits for claimant Katrina Ernst, deceased. Ms. Ernst's daughter, Alexis Wischer, was substituted as the plaintiff upon Ms. Ernst's death.  For clarity's sake, Ms. Ernst is referred as "plaintiff" throughout this Report and Recommendation.

DIB application.   Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## I.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.   42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.   42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.   If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).    The claimant has the burden of proof at the first four

steps of the sequential evaluation process.    *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

548 (6th Cir. 2004).    Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy.    *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

**B.    The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] met the insured status requirements of the Social Security Act through the date of death.

> 2. The [plaintiff] did not engage in substantial gainful activity during the period from her alleged onset date of March 1, 2005 through the date of her death (20 C.F.R. 404.1571 *et seq.*).

> 3. Through the date of her death, the [plaintiff] had the following severe impairments: Depression, posttraumatic stress disorder (PTSD), a history of major depressive disorder in remission, a history of opiate drug dependence/abuse, and back pain secondary to degenerative disc disease of the lumbar spine (20 CFR404.1520(c)).

> 4. Through the date of her death, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

> 5. After careful consideration of the entire record, the [ALJ] finds that, through the date of her death, the [plaintiff] had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c).   Specifically, she could have lifted and carried 50 pounds occasionally and 20 pounds frequently.   She could have sat for up to 2 hours at a time; stood for up to 2 hours at a time; and

3

ambulated for up to one hour at a time.   She could have performed occasional bending and stooping activities.   She could have performed frequent squatting and kneeling activities.   She could have performed occasional crawling and climbing activities.   She was able to handle objects without difficulty.   For purposes of the [plaintiff]'s mental functional capacity the following terms are used: "none" refers to absent or minimal limitations; "slight" refers to mild limitations[,] but the individual can generally function well; "moderate" refers to moderate limitation, but the individual is still able to function satisfactorily; "marked" refers to serious limitations and the ability to function is severely limited, but not precluded; and "extreme" refers to major limitation with no useful ability to function in this area.   In this regard the [plaintiff] had moderate limitation in her ability to understand, remember, and carry out short, simple instructions.   She had marked limitation in her ability to understand, remember, and carry out detailed instructions.   She had slight impairment in her ability to make judgments on simple, work-related decisions.   She had slight impairment in her ability to interact appropriately with the public, and supervisors.   She had moderate impairment in her ability to interact appropriately with co-workers. She had at least moderate impairment in her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting.

6. Through the date of her death, the [plaintiff] was capable of performing her past relevant work as a Housekeeper.   This work did not require the performance of work related activities precluded by the [plaintiff]'s residual functional capacity (20 CFR 404.1565).

7.  The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from March 1, 2005, the alleged onset date, through April 29, 2011, the date of her death (20 CFR 404.1520(f)).

(Tr. 14-22).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards.   *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,

478 F.3d 742, 745-46 (6th Cir. 2007).

4

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

Plaintiff raises two assignments of error on appeal. First, plaintiff asserts the ALJ erred in weighing the psychological opinion evidence of record. Specially, plaintiff contends the ALJ erred by giving more weight to the opinions of the ME and state agency reviewing psychologist regarding her mental capacity than he gave to the opinion of Susan Kenford, Ph.D., the consultative examining psychologist. Plaintiff argues that because the ALJ erred in weighing this opinion evidence, his listings finding and RFC formulation are also erroneous. Second,

5

plaintiff contends the ALJ erred in his consideration of the testimony of Esther Oakes, plaintiff's mother. (Doc. 13).

>    1. <u>The ALJ did not err in weighing the medical opinions of record and the ALJ's listing and RFC findings are supported by substantial evidence.</u>

a. *Medical Evidence*

The following is a summary of the pertinent medical record evidence. Plaintiff received mental health treatment at Greater Cincinnati Behavioral Health (GCBH) from August 2008 to April 2011.[2] (Tr. 616-22, 623-74, 723-55). At her August 11, 2008 intake with GCBH, plaintiff reported that she had a history of physical abuse, rape, and cocaine abuse. (Tr. 616-17). Plaintiff further reported that she had been "kicked out of school" in the eighth grade and that she gave birth to three children by age 23. (Tr. 616). Plaintiff reported that she had not received psychiatric treatment prior to 2007, and had never been hospitalized for psychiatric reasons. (Tr. 617). Plaintiff also reported that she had always been depressed and nervous and that her symptoms included having feelings of loneliness, hopelessness, and worthlessness. She reported she had "unpredictable" moods and experienced sleep and appetite disturbances. (*Id.*). On mental status examination, plaintiff was found to be alert and oriented x4; she was polite and cooperative; her affect was labile; her judgment was fair and her insight was limited; and she was tearful several times. (*Id.*). The intake therapist diagnosed plaintiff with major depressive disorder, recurrent, moderate and cocaine abuse in remission, and assigned her a Global Assessment of Functioning (GAF) score of 50.[3] (*Id.*).

---

[2] Plaintiff was referred for mental health treatment after being hospitalized for a spider bite. (Tr. 617).

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of

January 2009 treatment notes include plaintiff's reports that she was feeling sad, alone, and hopeless. (Tr. 672). Plaintiff was observed as alert, coherent, cooperative, and pleasant, though tearful at times, and with a dysthymic mood. (*Id*.). Plaintiff was diagnosed with major depressive disorder, recurrent moderate and PTSD and was treated with Vistaril and Symbyax. (Tr. 672-73). In February 2009, plaintiff's reported a better mood and her psychiatrist observed that she was cooperative and pleasant, with a brighter mood and better modulated affect; plaintiff was prescribed Ambien. (Tr. 669-71). March 2009 treatment notes include plaintiff's reports that the Ambien helped with sleep and that her mood was better, but she continued to report anxiety and nervousness. Plaintiff's psychiatrist observed plaintiff was cooperative, pleasant, and "happy" with appropriate affect, though plaintiff had some psychomotor agitation. (Tr. 666-68). In April 2009, plaintiff continued to report feeling anxious and said that the Symbyax was not helping, but the Ambien was still helpful with sleep. Plaintiff was observed as being tearful and having an anxious affect. (Tr. 663-65). Plaintiff reported in May 2009 that she ran out of medication but that the Celexa and Ambien were helpful. Plaintiff was described as being talkative, cooperative, and pleasant, and having a euthymic mood and brighter affect. (Tr. 660-62). June 2009 treatment notes reflect that plaintiff stopped taking Celexa because it was making her nauseated; she was prescribed Zoloft as a replacement. Plaintiff was observed as talkative, pleasant, and cooperative, but with an anxious mood and appropriate affect. (Tr. 657-59). In August 2009, plaintiff continued to report feeling nauseated on Zoloft and she was started on Buspar. Plaintiff reported that she was looking for a job and her psychiatrist observed

---

severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. Individuals with scores of 31-40 are classified as having "[s]ome impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood." *Id*. Individuals with

that she was pleasant, cooperative, and talkative with a brighter, wide-range affect, though her mood was anxious.  (Tr. 654-56).  Plaintiff presented with an anxious and sad mood in September 2009; she reported feeling lonely and helpless because her ex-husband left for California with her two sons; and she was started on Lexapro.  (Tr. 650-52).  In October 2009, plaintiff said she stopped taking Lexapro because it caused stomach problems and she was prescribed Depakote.  Plaintiff was observed as being generally pleasant and cooperative with a wide range affect, but her mood was worse and she presented with some psychomotor agitations.  (Tr. 648-49).  Treatment notes from December 2009 include plaintiff's reports that she was living with her sister's family.  Her psychiatrist observed that plaintiff was pleasant and cooperative with a euthymic mood and wide range affect, though she continued to present with psychomotor movements in her leg.  (Tr. 644).  In February 2010, plaintiff's psychiatrist observed that she was pleasant and cooperative, but sad about her financial situation.  Plaintiff had a wide range affect and was coherent.  (Tr. 641-46).  March 2010 treatment notes include plaintiff's psychiatrist's notation that there "was not much compliance" and that plaintiff stopped or never took her prescribed Depakote.  Plaintiff was observed as pleasant and cooperative with appropriate affect and euthymic mood.   (Tr. 638-40).  The above treatment records show that plaintiff was consistently assigned a GAF score of 45, indicative of moderate symptoms.[4]

On May 11, 2010, plaintiff's individual service plan (ISP) was updated.  Plaintiff reported that she had been unable to obtain housing, but would be starting a new job at Taco Bell in a couple of weeks.  Plaintiff reported she had problems: sleeping and concentrating;

---

scores of 41-50 are classified as having moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning.  *Id.*

[4]The treatment notes also reflect that plaintiff did not show up for counseling sessions on November 3, 2009, July 1, 2010, and September 9, 2010.  (Tr. 623, 626, 647).

forgetting things; not thinking clearly; feeling anger and wanting to hurt others; being nervous and paranoid that people were talking about her; having mood swings; acting strangely; and being afraid of people or places she was previously comfortable with. (629-34). Treatment notes from the following day include her psychiatrist's observations that plaintiff was cooperative and pleasant and her mood was euthymic; she had a wide range affect; and she was coherent and oriented. (Tr. 633-37).

In October 2010, plaintiff's counselor at GCBH completed an Assessment Update Form and noted that plaintiff had the following symptoms and functional problems: problems with medication self-management; inability to secure or maintain housing and employment; and anxiety, fear, or phobias which result in isolation. (Tr. 752). Plaintiff was also reported as being aware of her health issues and possessing good self-care skills. (Tr. 753).

Plaintiff's ISP was updated again in November 2010. (Tr. 746-51). Plaintiff continued to report having trouble sleeping and difficulty concentrating; forgetting things; not thinking clearly; feeling anger and wanting to hurt others; being nervous and paranoid that people were talking about her; having mood swings; acting strangely; and being afraid of people or places she was previously comfortable with. (Tr. 746-51). That same month, plaintiff reported feeling "funny" on Wellbutrin and was started on Neurontin. (Tr. 743). Plaintiff's psychiatrist observed that plaintiff had an anxious mood. (*Id.*).

In March 2011, plaintiff reported feeling lonely and that the Neurontin was working better than Depakote. Plaintiff also reported that she was currently taking prescribed Vicodin. Plaintiff's psychiatrist observed her as talkative and pleasant, but upset about her life situation at the moment. Plaintiff's mood was anxious and she had a wide range affect. (Tr. 729-31).

9

Plaintiff did not show up for appointments scheduled in December 2010, January 2011, and April 2011.[5]  (Tr. 724, 734, 738).

On June 10, 2010, Susan Kenford, Ph.D., examined plaintiff for disability purposes.  (Tr. 590-97).  Plaintiff's chief complaints were back problems and emotional issues.  (Tr. 590). Plaintiff appeared with her case manager from GCBH, Sarah Goldschmidt.  (*Id.*).  However, Dr. Kenford noted that Ms. Goldschmidt was unable to provide additional information and was unaware that plaintiff had stopped taking Wellbutrin on her own accord.  (Tr. 591-92).  Plaintiff reported that she never took prescribed psychotropic medication for any appreciable amount of time due to how they made her feel.  (*Id.*).  She reported only past use of marijuana.  (Tr. 591). Plaintiff reported that she will get "physical" with people when angry, but acknowledged that she mostly uses words.  (*Id.*).  Plaintiff also said that she likes to spend her time hanging out with friends and interacting with her children.  (Tr. 595).  Plaintiff reported that she was independent with her personal care and was able to do cooking, cleaning, laundry, and grocery shopping. (Tr. 595).

Dr. Kenford observed that plaintiff had some problems with motor behaviors and was limping when she came into her office.  (Tr. 593).  During testing, plaintiff made several errors counting down from 20 to 1, but showed no difficulty spelling "world" forwards or backwards. (Tr. 594).  Dr. Kenford reported that plaintiff's affect was unremarkable and her expression was appropriate to thought content, but she appeared anxious and presented with variable real world and hypothetical judgment.  (Tr. 593).  Dr. Kenford assessed plaintiff with depressive disorder NOS and borderline intellect and assigned her a GAF score at 35.  (Tr. 596).  Dr. Kenford

---

[5]Plaintiff was pronounced dead on April 29, 2011.  (Tr. 685).  The Hamilton County Coroner's office opined that plaintiff's death was due to the "[c]ombined toxic effects of opiates, benzodiazepines, and cocaine." (Tr. 687).

opined that plaintiff's ability to get along with others, including co-workers and supervisors, was markedly impaired; her variable performance on formal tasks of attention and concentration showed marked impairment as she did poorly when asked to retain and manipulate information in the short-term; her ability to perform simple repetitive tasks was markedly impaired based on her self-reports; and her ability to handle the everyday stresses and pressures of a general work environment was extremely impaired.   (Tr. 597)

State agency psychologist, Bonnie Katz, Ph.D., reviewed the record on June 29, 2010, and opined that plaintiff had mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.   (Tr. 608).   Dr. Katz also completed a mental residual functional capacity assessment in which she concluded that plaintiff was markedly limited in her ability to carry out detailed instructions.   (Tr. 612).   Plaintiff was found to be moderately limited in her abilities to: understand and remember detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal work-day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.   (Tr. 612-13).   Dr. Katz gave no weight to Dr. Kenford's opinions because "they were not supported by the [treating source medical evidence of record] or the functional information provided by plaintiff."   (Tr.

11

615).    Dr. Katz noted that plaintiff herself reported that medication helped her irritability when she had taken them, which was also supported by the office visit notes from GCBH.    (*Id.*).

Dr. Katz concluded:

[Plaintiff]'s allegations are generally credible.  However, her statements about her functioning and the severity of her symptoms are not fully credible, as she provides inconsistent information.  [Plaintiff] tells adj in phone call that she rarely leaves home and that she will only leave the house if someone is with her. In contrast, she tells [Dr. Kenford] that she does her own grocery shopping and goes to the store most days since she doesn't plan meals out in advance.  She reports she does her own cooking, cleaning, and laundry.  She reports she is able to pay bills and her case manager reports [Plaintiff] is able to take care of her basic needs, but that she is impulsive and unable to budget well ([plaintiff] agrees).    Case manager reports [plaintiff] does not appear to be using drugs/alcohol, but that her friends do use heavily.  In addition, [plaintiff]'s efforts on mental status exam at the psych [consultative evaluation] appear to be inconsistent; [Plaintiff] was able to spell 'world' forward and in reverse, but was (sic) made 2 errors counting down from 20 to 1.    Similarly, she gave an articulate abstract interpretation of one proverb but said 'I don't know' in response to a second proverb.    Further, she alleges that she can't get along with coworkers due to being short-tempered, impulsive, hostile.    In contrast, she reports having many friends, seeing a few friends daily, staying with one friend for over a month.

[Plaintiff] can understand, remember, and carry out simple and somewhat complex tasks that do not involve more than daily planning.  Symptoms interfere with ability to sustain close consistent attention to detail.  She can make simple decisions.  She can relate to coworkers and supervisors on a superficial and occasional basis only and would be unable to deal with the public in a reliable manner.    [Plaintiff] can deal with occasional changes in routine.  [Plaintiff] would require a setting with clear performance expectations and no fast-paced production demands.  [Plaintiff] should not be required to influence others to follow instructions.

(Tr. 615).

On November 15, 2010, Carl Tishler, Ph.D., reviewed the record and affirmed Dr. Katz's assessment.    (Tr. 675).

George Rogers, Ph.D. testified at the second hearing as the medical expert.    (Tr. 53-66).

12

Dr. Rogers testified that plaintiff did not meet or medically equal a listed impairment; his opinion

was limited to the criteria of Listings 12.04, 12.06 and 12.09. (Tr. 54-44). Dr. Rogers further

testified that his review of the record did not support Ms. Oakes' testimony concerning plaintiff's

paranoia. (Tr. 56-57). Dr. Rogers stated that plaintiff's PTSD related symptomatology

supported a finding that she had marked restriction in her ability to maintain concentration,

persistence, or pace. (Tr. 61). Dr. Rogers based this opinion on her last job and her inability to

function, in that she couldn't keep up with the work, she wasn't quick enough, and she didn't

understand the orders. (*Id.*). Dr. Rogers opined that plaintiff's social functioning and activities

of daily living were mildly impaired; her ability to understand, remember, and carry out short and

simple instructions was moderately impaired; and her ability to understand, remember, and carry

out detailed instructions was markedly impaired due to her limited education. (Tr. 60, 63-64).

Dr. Rogers also testified that based on plaintiff's last work experience, it could be a "possibility"

that plaintiff would have marginal adjustment such that even a minimal increase in mental

demands would be predicted to cause the individual to decompensate. (Tr. 62).

   b. *The ALJ's Decision*

   The ALJ adopted the RFC limitations set forth by Dr. Rogers and found that plaintiff had

moderate limitation in her ability to understand, remember, and carry out short, simple

instructions; marked limitation in her ability to understand, remember, and carry out detailed

instructions; slight impairment in her ability to make judgments on simple, work-related

decisions; slight impairment in her ability to interact appropriately with the public, and

supervisors; moderate impairment in her ability to interact appropriately with co-workers; and at

least moderate impairment in her ability to respond appropriately to work pressures in a usual

work setting and to changes in a routine work setting.  (Tr. 17, 19).  The ALJ explained that Dr.

Rogers' testimony was deserving of "great weight" because at the ALJ hearing, Dr. Rogers

"provided ample support for his opinion and referred to several sources from the record.  He

further had a superior longitudinal view of [plaintiff]'s treatment history and was able to hear

Ms. Oakes['] testimony regarding her daughter prior to formulating his professional opinion."

(Tr. 19-20).

      The ALJ determined that Dr. Kenford's opinion was entitled to "reduced weight"

because: (1) plaintiff's statements to Dr. Kenford were inconsistent; (2) plaintiff put forth

inconsistent effort on testing during Dr. Kenford's examination; (3) plaintiff did not inform Dr.

Kenford about her history of substance abuse, her noncompliance with prescribed medication, or

her failure to show up for scheduled therapy appointments; and (4) plaintiff misrepresented her

physical state to Dr. Kenford.  (Tr. 20-21).  In making these findings, the ALJ gave "great

weight" to Dr. Katz's refutations of Dr. Kenford's findings.  (Tr. 20, citing Tr. 614-15).

      c. *Resolution*

      "The Commissioner has elected to impose certain standards on the treatment of medical

source evidence."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  "These standards, set

forth in administrative regulations, describe (1) the various types of evidence that the

Commissioner will consider, 20 C.F.R. § 404.1512; (2) who can provide evidence to establish an

impairment, 20 C.F.R. § 404.1513; and (3) how that evidence will be evaluated, 20 C.F.R. §

404.1520b."  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).  This

evidence may include "medical opinions, which 'are statements from physicians and

psychologists . . . that reflect judgments about the nature and severity of [a claimant's]

14

impairment(s), including [ ] symptoms, diagnosis and prognosis,' physical and mental restrictions, and what the claimant can still do despite his or her impairments." *Id.* (citing 20 C.F.R. 404.1527(a)(2)).

The applicable regulations lay out the three types of acceptable medical sources upon which an ALJ may rely: treating source, nontreating source, and nonexamining source. 20 C.F.R. § 404.1502. When treating sources offer opinions, the Social Security Administration is to give such opinions the most weight and is procedurally required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). This requirement only applies to treating sources. *Id.* at 876. "With regard to nontreating, but examining, sources, the agency will simply generally give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined him." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1)) (internal citations omitted). With this framework in mind, the Court turns to plaintiff's arguments.

Plaintiff contends that Dr. Kenford's opinion should have been accorded greater weight than that given to the non-examining medical expert, Dr. Rogers, or the state agency psychologists because Dr. Kenford was the only medical source to actually interview plaintiff and therefore she was in a better position to evaluate plaintiff's veracity and credibility. (Doc. 13 at 5). In this case, there is no opinion from a treating source on the limiting effects of plaintiff's mental impairments. Therefore, the weight to a non-treating medical source like Dr. Kenford depends on several factors, including the medical specialty of the source, how

well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). The weight to be afforded the opinion of a non-examining source like Dr. Rogers or Dr. Katz depends on the degree to which the source provides supporting explanations for the opinion and the degree to which the opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. *Id.*

The fact that Dr. Kenford actually examined plaintiff is but one factor the ALJ considered among several in weighing Dr. Kenford's opinion. As the ALJ explained in his decision, other factors weighed against giving Dr. Kenford's opinion more weight than that of Dr. Rogers, whose opinion was consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4). The ALJ's decision in this regard is supported by substantial evidence.

The ALJ reasonably determined that Dr. Kenford's opinion that plaintiff had a "marked" impairment in her ability to get along with others, including co-workers and supervisors (Tr. 597), is inconsistent with plaintiff's own reports and the GCBH treatment notes. Plaintiff told Dr. Kenford that she "will get physical with people but she mostly uses words." (Tr. 593). Yet, plaintiff also reported that she spent most of her time with friends or talking with her children. Plaintiff's social worker also reported that plaintiff was not defiant or combative. (Tr. 595). In addition, progress notes from GCBH consistently show that plaintiff was pleasant and cooperative during treatment. *See, generally*, Tr. 616-74, 723-55. This evidence substantially supports the ALJ's decision to give "reduced weight" to Dr. Kenford's opinion.

The ALJ also reasonably determined that plaintiff's efforts on mental status examination with Dr. Kenford were inconsistent, as noted by Dr. Katz in his report, and further supported the

16

reduced weight to Dr. Kenford. The ALJ noted that plaintiff was able to spell "world" forward and in reverse, but she made two errors in counting down from 20 to 1. (Tr. 20, 615). Likewise, plaintiff "gave an articulate abstract interpretation of one proverb but said 'I don't know' in response to a second proverb." (Tr. 615). This inconsistent effort was another factor that tended to contradict Dr. Kenford's opinion.

Further, it was reasonable for the ALJ to find that plaintiff's misrepresentations to Dr. Kenford during her examination resulted in an incomplete picture of plaintiff's history and credibility. Plaintiff misrepresented her physical state and medical history during the consultative examination. Dr. Kenford noted that plaintiff was limping and plaintiff reported that she had been limping "off and on" for several weeks. (Tr. 593). However, on April 19, 2010, consultative examining physician Gary Ray, M.D., examined plaintiff and found that she had no limitations in her ability to walk. (Tr. 579-81). In this same vein, the record clearly establishes that plaintiff had a history of substance abuse. *See* Tr. 617. Plaintiff told Dr. Kenford that her father had a history of substance abuse problems and that she previously used marijuana, but she did not report her own history of substance abuse during the consultative examination. (Tr. 591). Based on the inconsistencies between the information presented to Dr. Kenford by plaintiff and those contained in the remainder of the record, the ALJ reasonably determined that Dr. Kenford's opinion was entitled to "reduced weight." *See* 20 C.F.R. § 404.1527(c)(6) (in weighing medical opinions, the ALJ is permitted to consider "the extent to which an acceptable medical source is familiar with the other information" in the record).

The ALJ is the ultimate decision-maker regarding plaintiff's RFC and must consider the opinions of medical sources and other relevant evidence. *See* 20 C.F.R. §§ 404.1527(c),

17

404.1545. In this case, the ALJ was presented with treatment notes from plaintiff's treating

mental health providers, three consistent medical opinions from Drs. Katz, Tishler, and Rogers

that plaintiff retained the ability to work, and Dr. Kenford's contrary opinion that plaintiff's

suffered from functional limitations related to her mental impairments that precluded

employment. In determining plaintiff's RFC, the ALJ considered the record as a whole and

determined that Dr. Rogers' opinion, which was based on his review of the entire record,

supported an RFC for a range of medium work. The ALJ's decision discusses the evidence and

the rationale for giving "greater weight" to Dr. Rogers' opinion and for giving "reduced weight"

to Dr. Kenford's opinion. The ALJ complied with the applicable regulations in weighing the

medical opinions of record and in formulating plaintiff's RFC. Accordingly, the Court finds the

ALJ did not err by discounting Dr. Kenford's conclusions or in determining that plaintiff retained

the mental RFC to perform a limited range of medium level work.

Next, plaintiff argues the ALJ mischaracterized Dr. Rogers' testimony, which plaintiff

maintains supports a finding that she met the paragraph A criteria of Listings 12.04 and 12.06

and the paragraph C criteria of Listing 12.04. Listing 12.04 governs affective disorders, such as

depressive disorders, and Listing 12.06 governs anxiety-related disorders. The required level of

severity for these Listings is met when both the "paragraph A" and "paragraph B" criteria of the

Listings are satisfied, or when the criteria of "paragraph C" are satisfied. 20 C.F.R. Pt. 404,

Subpt. P, App. 1, §§ 12.04, 12.06.

To satisfy the "paragraph A" criteria of Listing 12.04, the mental impairment must result

in medically documented persistence, either continuous or intermittent, of one of the following:

    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or

      c. Sleep disturbance; or

      d. Psychomotor agitation or retardation; or

      e. Decreased energy; or

      f. Feelings of guilt or worthlessness; or

      g. Difficulty concentrating or thinking; or

      h. Thoughts of suicide; or

      i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

      a. Hyperactivity; or

      b. Pressure of speech; or

      c. Flight of ideas; or

      d. Inflated self-esteem; or

      e. Decreased need for sleep; or

      f. Easy distractibility; or

      g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

      h. Hallucinations, delusions, or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.   To satisfy the "paragraph A" criteria of Listing

12.06, there must be medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

      a. Motor tension; or

      b. Autonomic hyperactivity; or

      c. Apprehensive expectation; or

      d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

To satisfy the "paragraph B" criteria for both Listings 12.04 and 12.06, the mental

impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.   A marked limitation means more than moderate but less than extreme.   *Id*., § 12.00 (C).   Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.   *Id*., § 12.00(C)(4).

> To satisfy the "paragraph C" criteria of Listing 12.04, plaintiff must establish a:
>
> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id*., § 12.04(C).   To satisfy the "paragraph C" criteria of Listing 12.06, plaintiff is required to show that her mental impairments result in a "complete inability to function independently outside the area of [her] home."   *Id.* § 12.06(C).

Plaintiff asserts that the ALJ "mischaracterized or otherwise misinterpreted the content and tenor of Dr. Rogers' testimony" by failing to find that plaintiff's mental impairments met or medically equaled Listing 12.04 or 12.06.   (Doc. 13 at 6).   Specifically, plaintiff contends that "[p]er Dr. Rogers' testimony the 'A' criteria of both Listing 12.04 and 12.06 were met" and that

"at least one of the 'B' criteria set forth in both Listings was also met" as Dr. Rogers testified that plaintiff was markedly limited in her ability to maintain concentration, persistence or pace. (*Id.*). Plaintiff also contends that because Dr. Rogers opined that there was a "possibility" that plaintiff would suffer from marginal adjustment if faced with a minimal increase in mental demands which would cause her to decompensate, that the "paragraph C" criteria of Listing 12.04 was met. (*Id.*).

Plaintiff has the burden at Step Three of the sequential evaluation process to show she met or equaled a listing. *See* 20 C.F.R. § 404.1520(a)(4)(iii). It was therefore incumbent upon plaintiff to put forth medical evidence establishing that she met *all* of the requirements of Listings 12.04 and 12.06 to meet this burden. *See Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990). Plaintiff has not identified any medical opinion evidence supporting a finding that she met *all of* the "paragraph B" criteria of Listings 12.04 and 12.06. Dr. Rogers did testify that based on plaintiff's most recent work experience that it was "a possibility" that she suffered from a residual disease process that had resulted in such marginal adjustment that even a minimal increase of mental demands or change in the environment would be predicted to cause [plaintiff] to decompensate." (Tr. 62). However, the ALJ followed up this testimony by explicitly asking Dr. Rogers if there was enough evidence in the record to establish the "paragraph C" criteria and Dr. Rogers replied, "No." (*Id.*). Plaintiff has not met her burden of establishing that her mental impairments met the criteria of either Listing 12.04 or 12.06 and, therefore, the ALJ did not err in this regard.

Finally, plaintiff argues the ALJ erred by not providing a specific discussion devoted to whether her mental impairments medically equaled these listings based on the evidence showing

that she "very nearly met" their criteria.   (Doc. 13 at 6).   The Sixth Circuit has expressly

declined to adopt a blanket rule that remand is required whenever an ALJ

"provides minimal reasoning at step three of the five-step inquiry."   *See Forrest v. Comm'r of*

*Soc. Sec.,* -- F. App'x --*,* No. 14-5421, 2014 WL 6185309, at *5 (6th Cir. Nov. 17, 2014).   In

*Forrest*, the ALJ found at Step Three of the sequential evaluation process only that the plaintiff's

impairments did not meet or medically equal the severity of an impairment in the Listings.   *Id.*,

at *4.   The Court nonetheless held that the ALJ had adequately completed this step of the

sequential analysis because the ALJ had "made sufficient factual findings elsewhere in his

decision to support his conclusion at step three."   *Id.*, at *6 (citing *Bledsoe v. Barnhart*, 165 F.

App'x 408, 411 (6th Cir. 2006) ("looking to findings elsewhere in the ALJ's decision to affirm a

step-three medical equivalency determination, and finding no need to require the ALJ to 'spell

out every fact a second time'"); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th

Cir. 2014) (Moore, J., dissenting) ("acknowledging that an ALJ's step-three analysis was

'cursory' but suggesting that, under our precedent, it is enough for the ALJ to support his

findings by citing an exhibit where the *exhibit* contained substantial evidence to support his

conclusion") (emphasis in original)).   Further, even if adequate support for the ALJ's step-three

findings was lacking, the Sixth Circuit in *Forrest* found the error was harmless because the

plaintiff had not shown that his impairments met or medically equaled in severity any listed

impairment.   *Id.*, at *7 (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir.

2011) (ALJ erred by providing no reasons to support his finding that a specific listing was not

met, and error was not harmless because claimant had possibly put forward sufficient evidence to

meet the Listings); *Audler v. Astrue*, 501 F.3d 446, 448-49 (5th Cir. 2007) (lack of step-three

explanation was not harmless where claimant carried her burden of showing she met a listing)).

*See also Layton ex rel. B.O. v. Colvin*, No. 12-12934, 2013 WL 5372798, at **8, 15 (E.D. Mich.

Sept. 25, 2013) (finding harmless error in child's SSI case where ALJ found without any analysis

that claimant did not have an impairment that met or equaled the Listings and ALJ immediately

moved on to compare the evidence to the six domains of functional equivalence; there was no

need to speculate as to how the ALJ might have weighed the evidence because the plaintiff failed

to identify any "conflicting or inconclusive evidence" that the ALJ failed to resolve or "evidence

favorable to the claimant that the ALJ simply failed to acknowledge or consider.").

Here, the ALJ provided a detailed explanation and cited to medical evidence to support

his finding that plaintiff's impairments did not meet Listing 12.04 or 12.06.  *See* Tr. 16-17.

Plaintiff does not cite to any authority that requires the ALJ to engage in any further analysis to

support his conclusion that these listings were not medically equaled.   In consideration of the

ALJ's discussion supporting his Step Three determination and the Sixth Circuit's holding in

*Forrest*, the Court finds the ALJ did not err at Step Three of the sequential evaluation process.

Accordingly, plaintiff's first assignment of error should be overruled.

2. The ALJ did not err in assessing the credibility of Ms. Oakes.

Plaintiff's mother, Ms. Oakes, provided testimony at the ALJ hearing regarding the

severity of plaintiff's mental and physical impairments.   (Tr. 33-48).   Ms. Oakes testified that

she spoke with plaintiff on the telephone on a daily basis and visited with her on the weekends.

(Tr. 36, 41).   Ms. Oakes stated that plaintiff was living in a group home/nursing home for about

a year after being bitten by a spider, but then plaintiff was living on her own or with friends.

(Tr. 37, 39-41).   According to Ms. Oakes, based on plaintiff's statements, plaintiff had "a hard

time" dealing with other people.  (Tr. 40-41).  Plaintiff told Ms. Oakes that she felt paranoid

and thought people were talking about her and that no one liked her.  (Tr. 42-43).  Ms. Oakes

also said that plaintiff would call her crying from the nursing home and complain that the nurses

were being mean to her.  (Tr. 43).  Ms. Oakes testified that plaintiff was fine in school when she

was younger, but that she developed issues with truancy when she was older.  (Tr. 43-44).  Ms.

Oakes further testified that plaintiff said she was not capable of learning and that plaintiff did not

know how to multiply.  (Tr. 44).  Ms. Oakes reported that plaintiff often complained of back

pain and that she started limping on her right leg.  (Tr. 45).  Ms. Oakes further testified that she

was unaware of the cause of plaintiff's death or whether plaintiff was abusing substances.  (Tr.

37).

The ALJ considered Ms. Oakes testimony under Social Security Ruling 06-03p[6] as

evidence from a "non-medical source" and afforded it "little weight."  The ALJ noted that Ms.

Oakes had the opportunity to observe plaintiff regularly but found that her testimony did "not

suggest a condition that precluded all work."  (Tr. 21).  Plaintiff argues that the ALJ should

have engaged in a more detailed discussion of Ms. Oakes' testimony because it supports

plaintiff's claims of disabling mental impairments.  (Doc. 13 at 9).  The undersigned finds the

ALJ did not err in assessing Ms. Oakes' hearing testimony.

Ms. Oakes, as plaintiff's mother, is considered an "other non-medical source" under the

Social Security regulations.  *See* 20 C.F.R. § 404.1513(d)(4).  This regulation provides that

---

[6]"Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner.  20 C.F.R. § 402.35(b)(1).  In *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004) the court refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social Security Regulations, but *assumed* that they are.  [The Court] makes the same assumption in this case."  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Cir. 2010) (emphasis in original).

"[i]n addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, [which the ALJ is required to consider, the ALJ] *may also* use evidence from other sources to show the severity" of a claimant's impairments.   20 C.F.R. § 404.1513(d) (emphasis added).   The assessment of the credibility of lay witnesses, as well as the weight to attribute to their testimony, is peculiarly within the judgment of the ALJ.   The testimony of a lay witness "must be given 'perceptible weight' [only] where it is supported by medical evidence." *Allison v. SSA*, No. 96-3261, 1997 WL 103369, at *3 (6th Cir. 1997) (citing *Lashley v. H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983)) ("Perceptible weight must be given to lay testimony where . . . it is fully supported by the reports of the treating physicians."). *See also Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004).

Here, the ALJ fulfilled his obligations under the Social Security regulations and rulings. The ALJ acknowledged and considered Ms. Oakes' testimony and explained that it did not support a finding that plaintiff suffered from any limitations not already accounted for in his RFC formulation.   (Tr. 21).   The ALJ was not required to give any further consideration or "weight" to Ms. Oakes' testimony as it was not fully supported by the medical evidence of record and, as summarized above, did not establish that plaintiff was unable to engage in substantial gainful activity.

Accordingly, plaintiff's second assignment of error should be overruled.

### III. Conclusion

For the reasons stated herein, the undersigned recommends that the ALJ's decision be

**AFFIRMED** and that this matter be closed on the docket of the Court.

Date: 2/6/15

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ALEXIS WISCHER o/b/o/                  Case No. 1:13-cv-810
Katrina Ernst, Deceased,                   Barrett, J.
      Plaintiff,                               Litkovitz, M.J.

      vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.   If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.   A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.   *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

27